1

2

3

4                    **UNITED STATES DISTRICT COURT**

5                        **DISTRICT OF NEVADA**

6                                  * * *

7   KAREN BODDEN,                              Case No. 2:14-cv-01968-RFB-NJK

8                    Petitioner,
                                               **Order Denying Petition for Writ of Habeas**
9         v.                                   **Corpus and Denying Certificate of**
                                               **Appealability**
10  FRANK DREESEN,[1] *et al.*,

11                   Respondents.

12        Karen Bodden's 28 U.S.C. § 2254 petition for a writ of habeas corpus is before the court

13  for final merits adjudication. ECF No. 18. Respondents have answered the petition, and Bodden

14  replied. ECF Nos. 92, 105.

15  **I.      Procedural History and Background**

16        On January 22, 2008, a jury found Bodden guilty of one count of murder with use of a

17  deadly weapon. Exhibit 165.[2] Bodden's husband Rob, an airplane mechanic, disappeared on or

18  about August 15, 2006. See ECF No. 92 at 2. Karen told law enforcement that she saw Rob fly

19  off from his Minden-Tahoe airplane hangar with someone named Ramos and that was the last

20  time she saw him. Rob's body was found in the Minden area on September 10, 2006. The State's

21  theory was that Karen shot Rob in the back of the head in his airplane hangar, used a cherry

22  picker (used to hoist engines) to move his body into the back of his truck, which was parked in

23  the hangar, and then dumped the body in a desert area not far from a residential road. No blood

24  _____

25        [1] According to the state corrections department's inmate locator page, Bodden is incarcerated at
    Florence McClure Women's Correctional Center. The department's website reflects Frank Dreesen is the
26  warden for that facility. https://ofdsearch.doc.nv.gov/form.php. At the end of this Order, the court directs
    the Clerk to substitute Frank Dreesen for prior respondent Jo Gentry, under, *inter alia*, Rule 25(d) of the
27  Federal Rules of Civil Procedure.

28        [2] Unless otherwise specified, the exhibits referenced in this Order are exhibits to respondents'
    motion to dismiss, ECF No. 41, and are found at ECF Nos. 42-57, 59-61.

1  or DNA was ever located at or inside the hangar. See Exh. 18 at 14.

2      The state district court sentenced Karen Bodden to life with the possibility of parole after

3  240 months, with a consecutive term of 48 to 120 months for the deadly weapon enhancement.

4  Exh. 165. Judgment of conviction was entered on March 5, 2008. Id. The Nevada Supreme Court

5  affirmed Bodden's conviction on February 1, 2010, and remittitur issued on February 26, 2010.

6  Exhs. 201, 202.

7      The state district court conducted an evidentiary hearing on Bodden's counseled state

8  postconviction habeas corpus petition. Exhs. 279, 280. The court thereafter denied the petition on

9  January 3, 2013. Exh. 290. On October 17, 2014, the Nevada Supreme Court affirmed the denial

10  of the petition, and remittitur issued on November 13, 2014. Exhs. 336, 337.

11      This Court received Bodden's federal habeas petition about November 25, 2014. ECF

12  No. 7. The Court appointed the Federal Public Defender as counsel for Bodden, and she filed a

13  counseled, amended petition. ECF No. 18. In May 2020, the Court granted respondents' motion

14  to dismiss in part, dismissing several grounds as untimely or unexhausted/procedurally barred.

15  ECF No. 83 at 22. The Court deferred analysis of ground 1 until this merits decision. The State

16  filed an answer to the remaining claims in December 2020. ECF No. 92.

17      Meanwhile, in August 2020, Bodden had filed an amended petition for genetic marker

18  analysis pursuant to NRS 176.0198 in state district court. Exh. A at ECF No. 97-1. The State had

19  introduced evidence at trial that she could not be excluded as the source of a hair found on the

20  tape that bound her husband's body in 2006. She argued that advances in DNA testing could

21  mean that new testing would exclude her and/or implicate another suspect. This Court granted

22  Bodden's motion to stay pending the litigation of that petition. ECF No. 100. In January 2022,

23  Bodden filed a motion for voluntary dismissal of her DNA petition after preliminary testing

24  revealed the relevant evidence was not suitable for further DNA testing. See ECF No. 102. This

25  Court then granted her motion to reopen this case. ECF No. 104. She also filed a reply to the

26  answer. ECF No. 105.

27  **II.    The AEDPA Standard of Review**

28      28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas

- 2 -

corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405–06 (2000), and citing Bell v. Cone, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 75 (quoting Williams, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Id. (quoting Williams, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102 (citing Lockyer, 538 U.S. at 75; see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011)

1    (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating

2    state-court rulings, which demands that state-court decisions be given the benefit of the doubt"

3    (internal quotation marks and citations omitted)).

4          To the extent that the petitioner challenges the state court's factual findings, the

5    "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review.

6    See, e.g., Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the

7    federal courts "must be particularly deferential" to state court factual determinations. Id. The

8    governing standard is not satisfied by a mere showing that the state court finding was "clearly

9    erroneous." Lambert, 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial
> evidence in the state-court record, it is not enough that we would reverse in similar
> circumstances if this were an appeal from a district court decision. Rather, we must
> be convinced that an appellate panel, applying the normal standards of appellate
> review, could not reasonably conclude that the finding is supported by the record.

13   Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004); see also Lambert, 393 F.3d at 972.

14         Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless

15   rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a

16   preponderance of the evidence that he is entitled to habeas relief. Cullen, 563 U.S. at 181.

**III.    Claim Rejected on Direct Appeal**

**a.    Ground 9**

         Bodden contends that insufficient evidence supported the verdict. "The Constitution

prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable

doubt." Jackson v. Virginia, 443 U.S. 307, 309 (1979) (citing In re Winship, 397 U.S. 358

(1970)). On federal habeas corpus review of a judgment of conviction pursuant to § 2254, the

petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced

at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

Id. at 324. "[T]he standard must be applied with explicit reference to the substantive elements of

the criminal offense as defined by state law." Id. at 324 n.16. On habeas review, this Court must

assume that the trier of fact resolved any evidentiary conflicts in favor of the prosecution and

must defer to such resolution. Id. at 326. Generally, the credibility of witnesses is beyond the

scope of a review of the sufficiency of the evidence. <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995).

### b.  Relevant Trial Testimony[3]

### Douglas County Sheriff's Office Investigator

Ronald Elges testified that he was assigned to the case after Rob Bodden's sister reported that he had been missing for ten days.  Elges interviewed Karen Bodden on August 28, 2006. Bodden told him she had seen Rob at the hangar about 8:30 in the morning on August 16. A white Cessna 421 with red pinstriping was parked out front. At some point she and Rob got into an argument about conflicting plans for their anniversary that weekend. He then left in the Cessna with a client she referred to as Ramos. About 1:30 the morning of August 17, Rob came home. He was swearing at her, took some pants and toiletries in a bag and left again. That was the last time she saw him. In the course of his investigation, Elges found some forged or altered checks from Rob's business – General Aviation Services – accounts from 2005. Initially, Bodden told Elges that she had looked for Rob's General Aviation Services checkbook but had been unable to find it. Elges asked her if she had written any checks on any of Rob's accounts since his disappearance and she said she had not.  Bodden described her relationship with her husband as "very rocky and loveless."  She said Rob was essentially a hermit who liked to play online poker and had few friends if any. The State introduced two notes that Elges examined during his investigation. One had Rob's cell phone number on it and said, "will be gone for the day." The second said, "Rob, girls and I are camping. Be back Tuesday. Call Johnny. Message at home." Bodden told Elges that she wrote the second note on August 20, 2006, after she saw the first note on the door of Rob's hangar. Bodden had driven Rob's truck to an interview with Elges. He said together they looked through Rob's truck and found his cell phone, wallet, and wedding band. Elges was unable to find any records reflecting that Rob worked on a Cessna 421 belonging to a Ramos or anyone at the airport who had ever heard of someone named Ramos. When Elges

---

[3] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record. The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the court overlooked it in considering Bodden's claims.

1    searched the Boddens' residence he noted that a knife appeared to be missing from a kitchen

2    butcher block. He looked around for it in the sink area and dishwasher and did not see it.

3        During his investigation Elges found that $5,195 was transferred from Rob's account and

4    that $5,195 was deposited into Karen Bodden's account on August 23, 2006.  On September 10,

5    2006, Elges was called to respond to the discovery of a dead body in a nearby desert area, which

6    was later identified as Rob Bodden. Pursuant to a search warrant, police found a firearm in Rob's

7    hangar.

8        Elges testified that during the course of his investigation, Karen gave him permission to

9    search the hangar and their home.  He agreed on cross-examination that investigators verified

10   that Rob had given Karen permission to use one of his credit cards to buy supplies for her pond-

11   building business. Elges said that the marks and tire marks in the hangar were consistent with the

12   use of the cherry picker/engine hoist to load Rob's body into the back of his truck.

13   **Sheriff's Deputy Johnathan Storke**

14       Storke testified that Karen Bodden first told him she last saw Rob about 8:30 a.m. on

15   August 16, 2006, when she watched him get in a plane with a man named Ramos and fly away.

16   Later she told him instead that very early the next morning Rob had returned home while she

17   was still in bed. He gathered some clothes, they had an argument, and he left. Storke asked

18   Bodden whether she wanted to file a missing person's report because it had been 11 days. She

19   said not really because she was in the process of moving out, and she wanted to be out of the

20   house before he returned. Storke wanted to call Rob's cell phone, but Karen told him Rob did not

21   have a phone. Storke later ascertained that Rob had a phone. When he confronted Karen about it,

22   she said she never said he did not have a phone she had said that he had left it in his truck. When

23   he asked Karen to let her in to the hangar she complied. Storke acknowledged that she did

24   everything he asked of her in connection with the investigation.

25   **Airport Witnesses**

26       Kevin Thomas testified that he worked for an aviation service at the Minden-Tahoe

27   airport, mainly in refueling.  He was extremely familiar with various types of planes. He arrived

28   for work on August 16, 2006, at 7 a.m.; there was little air traffic that morning. He did not recall

1    seeing a Cessna 421, which is a twin engine plane, take off or land. He testified that he

2    absolutely contacted the pilot of every twin engine plane that would land or take off because they

3    require a lot of fuel so he could make a big sale. Around 8:30 a.m. he was conducting a ramp

4    check directly across from Rob's hangar. He never saw any plane parked outside the hangar, nor

5    did he see Rob or anyone else.

6         Robert Brown testified that Rob was a tenant in Brown's hangar and his airplane

7    mechanic.  In August 2006, Rob was working on Brown's plane in Rob's leased hangar. Brown

8    later had to retrieve his plane from Rob's hangar on August 24. Brown did not recall telling

9    Deputy Storke that he may have seen Rob on August 19. He testified that during that time period

10   he was not at the airport much.

11        Brenda Stringham testified that she did upholstery work on airplanes.  She worked on

12   Rob's customers' planes in his hangar. On Wednesday morning August 16, 2006, Stringham

13   went by Rob's hangar at 8:35 on the way to her 9 a.m. dentist appointment. The hangar doors

14   were closed, and the pedestrian access door was locked. A note on the door said, "will be gone

15   for the day."  She did not see Rob's truck, but she saw Karen's SUV. Stringham returned on

16   Friday and under "will be gone for the day," someone had written, "Rob should be back today,

17   Sunday. He's with Ramos."

18        Dave Monti testified that he owned an aircraft repair business at Minden-Tahoe Airport

19   and had known Rob for about 15 years.  They were friends and Monti had been inside Rob's

20   hangar, which was always very neat, probably hundreds of times. Monti never saw Rob in an

21   airplane. Between 8 and 8:15 a.m. on August 16, 2006, Monti went to Rob's hangar. Rob's truck

22   was parked out front. The hangar doors were shut, and the pedestrian access door was closed and

23   locked. He did not see a note on the door. He did not see a Cessna 421 or any other plane parked

24   in front of the hangar. He went back about 10 or 10:30 a.m.; the truck was gone and Karen's

25   SUV with license plate KOIGIRL was parked there. He went back a third time about 2:00 p.m.;

26   Karen's car was gone, and Rob's truck was back. He never saw any note on the door. He went

27   back Thursday and Friday. Rob's truck was there but nothing or no one else. On Friday about

28   8:30 or 9 a.m., Monti returned again. The truck was there. No one was there, and everything was

1   locked. He saw a note on the door that said, "Gone with Ramos. Be back Sunday." The State

2   showed Monti the note and he agreed it was the one he saw. A typewritten section said, "Will be

3   gone for the day." The following Monday, August 21, Monti went back again and Karen and

4   Caroline were at the hangar. The large hangar door was open. Monti noticed that Rob's tools

5   were out, kind of in disarray. Karen told him she did not know where Rob was.

6       Kelly Rosser testified that he had a hangar at the Minden airport where he kept two

7   planes.  He said he had been a close friend of Rob's for about three years; they would work on

8   airplanes together in Rob's hangar. A pilot, Rosser frequently asked Rob to go up in a plane with

9   him but Rob never wanted to fly. He said Rob usually parked his truck outside the hangar; he

10  could not recall ever seeing Rob's truck inside the hangar. Rosser said that he spoke with Rob on

11  the phone late Tuesday afternoon August 15, 2006. After that, Rob did not answer any of his

12  phone calls. He went to the hangar and saw that both of Rob's motorcycles were there. He

13  noticed that a bunch of tools and airplane parts had been left out underneath the wing of an

14  airplane in the hangar. That struck Rosser as odd because he said Rob was extremely neat,

15  someone who put away all of his tools and meticulously cleaned up after every project.

16      Patrick Kelly testified that he worked at the Minden-Tahoe Airport.  Rob came over to

17  the hangar where Kelly was working at about 3 p.m. on August 15, 2006, looking for a tool. He

18  also said Rob hardly ever flew.

19      Debbie Ross testified that Rob had been working on her plane in his hangar at the time he

20  disappeared.  After Rob disappeared, Ross talked to Karen Bodden about getting her plane out of

21  the hangar. Bodden told Ross she thought Rob might have left to take a job and that he had told

22  her he would earn $10,000. Ross and Karen Bodden had arrived at the hangar one morning

23  before Rob's body was found and Rob's sister Barbara was there. She called Karen a "fucking

24  murderer."  Karen later was talking to Ross about the accusation, and Karen commented that she

25  "couldn't lift one of [Rob's] legs."

26      **Karen's Parole Officer**

27      Jennifer Stewart testified that she supervised Karen for about a six-month period in 2006

28  in connection to Karen's past conviction for embezzlement.  She said Karen expressed to her that

1    she planned to leave her unhappy marriage. Stewart had a home visit with Karen on August 22,

2    2006; Karen told her she did not know where her husband was. Karen was packing up and told

3    Stewart that since Rob had left, she was going to leave him.

4        **Rob's Accountant**

5        Lecia Nichols testified.  She said that she advised Rob to change the incorporation of his

6    business for tax advantages so that it would pass through him, and he would be taxed at his

7    individual rate. He declined, telling her that he did not want his wife to have control of or access

8    to his bank account. The State presented various checks from Rob's business account. Nichols

9    testified that Rob told her that he had written a check payable to Karen for $22 but that she had

10    altered it and deposited it for $2200. In another instance, he wrote a check to Karen for $300 but

11    she altered it and deposited it for $1300. Nichols testified that she was extremely familiar with

12    Rob's handwriting but did not recognize the signature of a check written to Karen Bodden on

13    August 22, 2006, for $3600 as that of Rob's. Nichols also did not recognize the signature on a

14    check dated August 22, 2006, for $5195 payable to Karen's business, Pond Goddesses, as Rob's.

15    Rob had told Nichols on two occasions that he would not turn Karen in to authorities.

16        **Forensic Scientist**

17        Michael Lyford, with the Washoe County Sheriff's forensic science division, testified

18    that he responded to the scene where the body was discovered.  He stated that in his experience if

19    a person was shot in the head with a small caliber weapon and the bullet did not exit the head

20    you would not necessarily see a lot of blood.

21        **County Forensic Pathologist**

22        Katherine Raven, forensic pathologist for the Washoe County Medical Examiner,

23    testified.  She stated that the condition of Rob's body at the autopsy was consistent with him

24    having been killed about August 15 or 16, 2006.  However, she could not identify the date of

25    death with a reasonable degree of medical certainty.  The skull injuries were consistent with

26    gunshot wounds inflicted from about one to twelve inches away, and two bullets were found in

27    the skull.

28        **Forensic Serologist**

Thomas Fedor testified that he is a forensic serologist and examined two hairs found at the crime scene, along with reference samples from Rob and Karen Bodden. He obtained a mitochondrial DNA sequence of the hairs. His analysis excluded Rob Bodden and failed to exclude Karen Bodden as the source of one of the hairs and excluded Karen and failed to exclude Rob as the source of the other hair. On cross-examination Fedor agreed that he could not draw the conclusion that the one hair was Karen's.

**Jail Informant**

Ramona Madore testified that she was in the Douglas County Jail with Karen Bodden. Bodden told Madore that she was being investigated for her husband's murder. She told her that someone had shot her husband twice at his place of work, wrapped him in a blanket and used a cherry picker to put him in the back of a vehicle to move the body to a desert area. Madore said Bodden told her that Rob would fly the Mexican Mafia to various places and maybe they had been upset with him and murdered him. On cross-examination Madore clarified that Bodden first told her that she did not know how her husband died and that she did not kill him.

**Accident Reconstructionist**

Nevada Highway Patrol trooper Michael A. Gamberg testified that as an accident reconstructionist he identified tire prints on the floor of Rob's hangar. Based on his comparison of the tire tread patterns on the hangar floor and Rob's Ford F-350 pickup truck, Gamberg opined that Rob's truck tires made the tracks in the hangar. On cross-examination Gamberg acknowledged that he had no idea when the tracks were made or what other traffic was in the hangar over the many months between when Rob's body was discovered and when Gamberg measured the tracks in the hangar.

**Realtor Beverly Johnson**

Johnson testified that she was a real estate broker and property manager. Karen and her daughter Caroline met with Johnson on August 23, 2006, because they were looking for a house to rent. Karen presented Johnson with a bank slip dated that day that showed a deposit of $5,195 and a balance of $8,945.87. On cross-examination, Johnson agreed that Karen had told her that she needed to move because she wanted to get away from her husband.

**Boddens' Neighbors**

Walter Harrison testified that he was a neighbor and friend of Karen and Rob.  Harrison said that Karen came to his house on the afternoon or evening of August 16, 2006, and told him and his wife that Rob had left at 2 or 3 a.m. to take a flight down to Southern California with a man named Ramos to work on an airplane for $10,000 under the table. Karen told Harrison that she followed Rob to the Minden airport and saw him leave in a plane with a red tail.

Jennifer Sclafani testified that she was Rob's neighbor for 15 years and met Karen when she married Rob in 2000 and moved into the house.  Sclafani had been on vacation and returned to learn that Rob was missing. She saw Karen and Caroline moving boxes into a truck and went to talk to Karen. During a 45-minute conversation, Karen said that Rob had left to be an airplane mechanic for drug dealers. Karen told Sclafani that they had flown off to a ranch; she would not give a more specific answer. Karen was agitated and laughing nervously. Karen commented that if she had actually killed Rob, he would have been too big for her to move.

**Hiker Who Discovered the Body**

Daniel Linn testified that he was out hiking on September 10, 2006.  He followed a terrible odor and discovered a body partially concealed by a blanket as well as a knife nearby.

### c.  Nevada Supreme Court Decision

The Nevada Supreme Court specifically referred to numerous pieces of evidence that it concluded constituted sufficient evidence to support the conviction:

> We conclude that the following evidence is sufficient to support Karen's conviction for willful, deliberate, premeditated murder with the use of a deadly weapon: (1) Karen did not report Rob missing; (2) Karen's conflicting stories about why Rob had disappeared; (3) Karen's stories were inconsistent with what others observed at the airport the morning of August 16, 2006; (4) Karen did not go to work the morning of August 16, 2006; (5) Karen's car was discovered at Rob's hangar the morning of August 16, 2006; (6) Karen had previously been convicted of embezzlement; (7) testimony and evidence establishing that Karen had been stealing money from Rob's business; (8) Rob's confronting Karen about stealing from him; (9) evidence that she continued to forge checks against his bank account after his disappearance; (10) Karen's description of their marriage as "rocky" and "loveless"; (11) the recovery of a knife from Karen's dishwasher that matched the knife found near Rob's body; (12) the tape, blankets, and paper towels found on Rob's body had similar characteristics to tape, blankets, and paper towels found in Rob's hangar; (13) Raven's testimony that Rob was shot twice in the head at close range; (14) evidence that Rob possessed two .22 caliber

firearms, a rifle, and semi-automatic pistol; (15) evidence that at least one of the bullets recovered from Rob's head was consistent with 22 ammunition; (16) Karen's comment to Jennifer Sclafani that she could not have moved Rob's body if she had murdered him; (17) Karen was one of only three people who had a key to Rob's hangar; and (18) Karen could not be excluded as being the source of hair found on Rob' body.[FN10]

[FN10: Karen asserts that the cumulative effect of the State's weak, circumstantial evidence, coupled with the district court's errors, denied her the right to a fair trial. Because we conclude that the district court (1) did not err in denying Karen's motion to suppress evidence seized pursuant to the September 10, 2006, search warrant; or (2) abuse its discretion in admitting evidence concerning the mitochondrial DNA sequence of hair found on Rob's body; and (3) that the verdict was supported by sufficient evidence, the district court did not commit error and, therefore, Karen's argument for cumulative error is without merit.]

No blood or DNA was detected in or around Rob's hangar. The State provided some evidence that Rob's truck had been inside the hangar and that the cherry picker had been moved. Still, the testimony recounted at some length above demonstrates that sufficient evidence supported the jury's conclusions. The evidence of Karen's actions and inactions support the verdict. Karen's shifting and conflicting accounts of events, actions while Rob was unaccounted for, past embezzlement and the evidence that she was taking money from Rob provide substantial evidence of her guilt. Airport employee witnesses lent more circumstantial evidence, especially testimony that both Karen and Rob's vehicles were present at the locked hangar at various times during the timeframe at issue. This Court generally defers to the jury on the issue of witness credibility. It cannot be said that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Bodden has not shown that the Nevada Supreme Court decision that sufficient evidence supported the verdict was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Federal habeas relief is therefore denied as to ground 9.

## IV.    Ineffective Assistance of Counsel Claims

Federal courts address ineffective assistance of counsel (IAC) claims under the two-part test announced in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In <u>Strickland</u>, the Supreme

Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney "made errors so serious that he or she was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," and (2) "that the deficient performance prejudiced the defense." Williams, 529 U.S. at 3991 (quoting Strickland, 466 U.S. at 687)). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Id. at 391 (citation and internal quotation marks omitted). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. (citation and internal quotation marks omitted). A reasonable probability is "probability sufficient to undermine confidence in the outcome." Id. (citation and internal quotation marks omitted). Additionally, any review of the attorney's performance must be "highly deferential" and must adopt "counsel's perspective at the time" of the challenged conduct to avoid "the distorting effects of hindsight. Strickland, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. Id.

Ineffective assistance of counsel under Strickland requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." Rompilla v. Beard, 545 U.S. 374, 380 (2005) (internal quotation marks and citations omitted). When the IAC claim is based on a challenge to a guilty plea, the Strickland prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985).

If the state court has already rejected an IAC claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the Strickland standard. See Yarborough v. Gentry, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id.

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." Cullen, 563 U.S.

at 190 (quoting <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009)). The Supreme Court emphasized that: "We take a highly deferential look at counsel's performance . . . through the deferential lens of § 2254(d)." <u>Id.</u> (citations and internal quotation marks omitted). Moreover, federal habeas review of an IAC claim is limited to the record before the state court that adjudicated the claim on the merits. <u>Cullen</u>, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," <u>id.</u> at 689, 104 S.Ct. 2052; <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, <u>Knowles</u>, 556 U.S. at 123. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 124. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Harrington</u>, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Id.</u> at 104 (citations and internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." <u>Id.</u> (internal quotation marks and citations omitted).

### a.  Ground 5

Bodden alleges that trial counsel was ineffective for failing to present the alternative theory that her husband left in a plane with a drug dealer named Ramos.

Defense trial counsel James Wilson testified at the evidentiary hearing on Bodden's state postconviction petition that in 23 years of private practice as an attorney he handled two murder cases. Wilson said that his defense theory was that the State could not prove their case; he felt that the prosecution's theory had significant holes. He explained that the defense presented theories to a focus group prior to trial. Wilson stated that they considered the Ramos defense but

1   concluded that it was a much weaker theory than the State's case. On cross-examination Wilson

2   stated that he presented the Ramos story to a mock jury, which flatly rejected that story as a lie.

3   Co-defense counsel Eric Johnson testified at the evidentiary hearing that he assisted Wilson in

4   this case.  He wanted the defense to put on a case that explained where Bodden was and what she

5   was doing at the relevant times. Wilson considered his arguments but disagreed. Together they

6   interviewed Karen's daughter Caroline Allen. Johnson said he never observed anything that

7   made him question Bodden's competency or mental health. He testified that when he reviewed

8   the detective's report it struck him as "short on evidence." The description of where Rob Bodden

9   was shot made Johnson think a defense that drug dealers shot him execution-style was starting to

10  make sense.

11      The defense also considered presenting the theory that Caroline—who disliked Rob—had

12  killed him and everything her mother did was to cover for Caroline.  Wilson found no evidence

13  to support that theory, however. He concluded that these alternative defenses would seriously

14  damage the defense's credibility.

15      The Nevada Supreme Court held that Bodden failed to show any deficiency or prejudice

16  relating to defense counsel not focusing on Ramos:

17          Fifth, appellant appears to argue that counsel was ineffective for failing to
18      elicit testimony from various witnesses that appellant had told them prior to and
        around the time of the victim's disappearance that the victim was considering
19      working on an airplane for an illegal drug runner named "Ramos." Appellant has
        failed to demonstrate deficiency or prejudice. Counsel testified that he could find
20      no evidence to corroborate appellant's "Ramos" story, and we conclude that it
        was not objectively unreasonable for counsel not to emphasize the self-serving
21      story. Moreover, appellant does not allege that the victim's statements fall under
        any exceptions to the prohibition against hearsay. See NRS 51.035; Maresca, 103
22      Nev. at 673, 748 P.2d at 6. We therefore conclude that the district court did not err
23      in denying this claim.

24

25      Bodden has not demonstrated that counsel was deficient for failing to present the theory

26  that Rob left with Ramos. Karen Bodden's version of events shifted time and again; her story about

27  Ramos was thin and lacked credulity. Wilson tested that he presented a defense involving Ramos

28  and a mock jury rejected it as lacking credibility. Accordingly, Bodden has failed to show that the

1   Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of,

2   Strickland. See 28 U.S.C. § 2254(d). Federal ground 5 is denied.

3          **b.  Ground 4(c)**

4          Bodden contends that counsel was ineffective for not calling her son, Bryan Allen, as an

5   alibi witness at trial. She argued that her son would have testified that he was working on ponds

6   with his mother during the timeframe that the State alleged she killed her husband.

7          Allen testified at the evidentiary hearing on Bodden's state postconviction petition that he

8   worked with his mother during the summer of 2006.He said that typically he would work his

9   masonry job in the morning and then help his mother with the heavier physical labor after about

10  3 p.m., frequently working until dark. Allen said he worked with his mother on the evening in

11  question, August 15, 2006, until dark, probably around 9 p.m., and then he and his mother and

12  sister went to dinner at Arby's. He said that he would have been available to testify to that effect

13  at trial. Under questioning by the court, however, Allen acknowledged that when the police

14  interviewed him around the time of the trial, he did not remember what he had been doing on

15  August 15, 2006. At some point in preparation for the evidentiary hearing and communicating

16  with Bodden's postconviction counsel, Allen said he was able to recall when he worked on the

17  pond with his mother. Defense counsel Wilson testified at the state postconviction evidentiary

18  hearing that at the time of the trial, Bryan Allen could not definitively say when he was with his

19  mother around the time in question.

20         The Nevada Supreme Court rejected this claim, explaining that Bryan Allen could not

21  provide an alibi:

22              First, appellant argues that counsel was ineffective for failing to
23         investigate and present to the jury alibi testimony from appellant's children.
           Appellant has failed to demonstrate deficiency or prejudice. The victim was
24         last in contact with or seen by any disinterested witnesses in the afternoon of
           August 15, 2006, and appellant told law enforcement officers that she last saw
25         the victim flying off in an airplane with "Ramos" around 8:30 a.m. on August
           16, 2006. The State argues that the Ramos story was a ruse appellant created
26         to conceal that she had murdered the victim and disposed of his body on
           August 15 and/or 16. Specifically, appellant argues that counsel should have
27         called on [Bryan] Allen and [Caroline] Allen to testify that they worked and
           ate dinner with appellant until late on August 15.[FN3] Allen admitted at the
28

evidentiary hearing that when he spoke with counsel before the trial, he was unsure about what he had been doing on the dates in question. Further, [Caroline] Allen did not testify at the evidentiary hearing, and appellant presented no other evidence to support an alibi. Accordingly, appellant failed to demonstrate the facts underlying her claim by a preponderance of the evidence. Moreover, even if she could have established the alleged alibi, she alleged no alibi for the hours between the end of dinner on August 15 and an early-afternoon lunch on August 16. Accordingly, appellant fails to demonstrate a reasonable probability of a different outcome had the alibi evidence been presented. We therefore conclude that the district court did not err in denying this claim.

[FN3: Petitioner also argues that counsel should have called K. Rasor to testify that she lunched with appellant on August 16. This is new argument not raised below, and we decline to consider it on appeal in the first instance. See Davis v. State, 107 Nev. 600, 606, 817 P.2d 1169, 1173 (1991), overruled on other grounds by Means, 120 Nev. at 1012-13, 103 P.3d at 33. Below, appellant argued that counsel should have called the witness to confirm that B. Allen and C. Allen worked late with appellant the evening of August 15.]

Bodden's son acknowledged that at the time of trial he could not say definitively when he had been with his mother around the time in question. She has not shown that counsel was deficient for failing to present supposed alibi testimony that was unavailable at trial. Bodden has not demonstrated that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, Strickland. See 28 U.S.C. § 2254(d). Federal habeas relief is therefore denied as to ground 4(c).

### c.  Grounds 4(a) and 4(b)

Bodden asserts that her counsel was ineffective for failing to call two clients who would have testified that she was working on their ponds during the timeframe in question. In ground 4(a) Bodden asserts that Pascal Steeves had hired her to work on his pond in August 2006.

Pascal Steeves testified at the hearing on Bodden's state postconviction petition that he hired her to construct a waterfall in his yard. He said he recalled working with Bodden on the project Friday through Sunday August 11-13. Steeves said, "I believe she was there every day that week the 14th through the 18th."He also testified at that hearing that he "didn't observe the time she came and left as this was a fixed price job." On cross-examination, Steeves stated he had no specific recollection of whether Bodden was at his house on August 15th.

1    In ground 4(b) Bodden contends that Joan Reid would have confirmed that she hired

2    Bodden to work on her pond and that before her husband's disappearance Bodden complained to

3    her that her husband was working on a drug dealer's plane.

4    Reid testified at the evidentiary hearing on Bodden's state postconviction petition that

5    Bodden worked on her pond in August 2006.  Reid said Bodden started on the day Reid wrote a

6    check for partial payment, August 17. Reid said that the work progressed quickly, but she would

7    see Bodden working on the pond only occasionally because Reid was usually at work during the

8    day. Reid said Bodden seemed perfectly normal and calm whenever they saw each other. Reid

9    estimates that about a week before Bodden actually started working on the pond, they met to

10   discuss the project. Bodden told Reid that her husband had been offered a job to work on some

11   drug dealer's airplanes and she was upset with him for even considering it and putting the family

12   in danger. Reid expressed surprise that she had not been called to testify at trial.

13   Bodden also states that Joan Reid would have testified that Bodden was working on her

14   pond beginning August 17, 2006, and she worked on that pond "fairly frequently." Reid testified

15   at the state postconviction hearing that she could not give an estimate whether Karen Bodden

16   would show up daily or even biweekly because she "wasn't home most of the week."

17   In response to questioning from the court at that hearing, Wilson said he had wanted to

18   call Bodden's daughter Kathryn as well as Joan Reid because they were both "fans" of Bodden,

19   but he could not identify any ways in which their testimony would be helpful. Reid could not

20   testify definitively about Bodden's whereabouts August 15-16, and Kathryn was not with her

21   mother around those dates.

22   The Nevada Supreme Court also pointed out that the clients could not provide an alibi:

23   Second, appellant argues that counsel was ineffective for failing to investigate
and present to the jury alibi testimony from appellant's former clients. Appellant
has failed to demonstrate deficiency or prejudice. The former clients testified at

24   the evidentiary hearing, but none could say with certainty whether or when
appellant was with them on August 15 or 16.[FN4] Counsel testified that because

25   the witnesses could have provided only a weak alibi at best, he did not call them
at trial because any benefit would have been outweighed by the negative impact

26   of wasting the jury's time. Appellant fails to demonstrate that counsel's strategy
was objectively unreasonable or that there was a reasonable probability of a

27   different outcome had counsel called these witnesses. We therefore conclude that

28

1   the district court did not err in denying this claim.

2       [FN4: To the extent that appellant is arguing that counsel was ineffective for
3   failing to introduce these witnesses' statements that, in the days following the
    victim's disappearance appellant did not act like someone who had just murdered
4   her husband, we conclude that appellant has failed to demonstrate deficiency or
5   prejudice. Such testimony is not "alibi" evidence, Black's Law Dictionary 79 (8th
    ed. 2004) (defining alibi as "[a] defense based on the physical impossibility of a
6   defendant's guilt by placing the defendant in a location other than the scene of the
7   crime at the relevant time"), and was not necessarily exculpatory. Accordingly,
    counsel was not objectively unreasonable in not eliciting it, and appellant fails to
8   demonstrate a reasonable probability of a different outcome at trial had counsel
    done so.]

9       Bodden cannot demonstrate that her counsel was deficient for failing to present testimony
10  by Steeves and Reid. Neither client was able to provide an alibi. Bodden was not prejudiced by
11  failure to introduce such non-alibi evidence. She has failed to show that the Nevada Supreme
12  Court's decision was contrary to, or involved an unreasonable application of, <u>Strickland</u>. <u>See</u> 28
13  U.S.C. § 2254(d). Federal grounds 4(a) and 4(b) are denied.

14          **d.  Grounds 1(a) – (g) are procedurally defaulted and the court previously**
15              **deferred a decision on whether to consider the claims' merits**

16      In ground 1 Bodden alleges that her trial counsel rendered ineffective assistance because
17  he should have presented expert testimony that would have undermined several critical aspects
18  of the State's case. Specifically, she insists counsel was ineffective for failing to present
19  testimony from:

20          (a) a forensic entomologist;

21          (b) a forensic pathologist;

22          (c) a forensic biologist;

23          (d) a crime scene expert;

24          (e) an expert to refute that Bodden used a cherry picker to move the body;

25          (f) an expert to rebut testimony that tire tracks found in the hanger matched Rob

26  Bodden's truck, and

27          (g) an expert familiar with drug smuggling.

28          (ECF No. 18 at 22-39.)

### i. Grounds 1(a), (b), (d), (e), and (f)

In deciding the motion to dismiss, this court concluded that these claims were unexhausted. Bodden insisted that if the claims were unexhausted, they should be deemed "technically exhausted" because if she returned to state court with these claims, they would be procedurally defaulted as untimely and successive. See 28 U.S.C. §2254(b)(1)(B). She further argued that that she could demonstrate cause and prejudice to excuse the procedural default under Martinez v. Ryan. 566 U.S. 1 (2012).

Generally, the ineffective assistance of postconviction counsel will not excuse the default of a federal habeas claim. However, in Martinez, the Supreme Court carved out a narrow exception:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel, or counsel in the proceeding was ineffective.

566 U.S. at 17.

The court later explained in Trevino v. Thaler that a federal habeas court can find cause to excuse a petitioner's default of an ineffective assistance of trial counsel claim where (1) the claim of ineffective assistance of trial counsel is substantial; (2) the "cause" is no counsel or ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding with respect to the ineffective assistance claim; and (4) state law requires an ineffective assistance claim to be raised in the initial review collateral proceeding. 569 U.S. 413, 423 (2013).

Bodden did in fact present most of these claims to the state district court in her state postconviction habeas corpus petition. With respect to counsel's alleged failure to: introduce testimony by a forensic entomologist (a) or forensic pathologist (b); offer testimony by a crime scene expert (d); offer expert testimony to rebut testimony that tire tracks found in the hanger matched Bodden's truck (f), offer expert testimony regarding use of the cherry picker (e), and present expert testimony regarding drug smuggling (g), she raised these in her state postconviction habeas petition. Thus, they were raised in her initial collateral review proceeding,

1   and Martinez is not implicated. See 566 U.S. at 16. She simply failed to exhaust the claims by

2   not raising them on appeal of the denial of the state petition. Grounds 1(a), (b), (d), (e), (f), and

3   (g) are, therefore, dismissed as procedurally barred from federal habeas review.[4]

4               **ii.  Ground 1(c)**

5           Bodden argues that she can demonstrate pursuant to Martinez that her state

6   postconviction counsel was ineffective in failing to raise federal ground 1(c) and that this claim

7   of ineffective assistance of trial counsel is substantial. In ground 1(c) Bodden asserts that counsel

8   was ineffective for failing to present testimony from a forensic biologist. She argues that a

9   forensic biologist could have testified that the fact that no trace of blood was found in the hangar

10  or anywhere else made it unlikely that Rob was killed there.

11          Defense trial counsel James Wilson testified at the evidentiary hearing on Bodden's state

12  postconviction petition that his defense theory was that the State could not prove their case; he

13  felt that the prosecution's theory had significant holes. He explained that the defense presented

14  theories to a focus group prior to trial. But he also recalled telling Bodden that despite significant

15  gaps in the State's case, because of statements Bodden had made, he believed that the jury would

16  convict her of first-degree murder. Wilson had a psychiatric evaluation completed, and the expert

17  told Wilson that his testimony would not be helpful to the defense. Wilson testified that in all the

18  time he spent with Bodden, he never had any concerns about her competency or mental

19  functioning.

20          Wilson explained the defense retained forensic crime scene investigator Dave Billau. He

21  watched the State's case in chief and he did not disagree with anything of significance. In fact,

22  Billau told Wilson that the State had done an "excellent" job with its investigation. Wilson

23  recalled that he considered calling forensic pathologist Dr. Terri Haddix to testify, but she had

24  not had significant issues with the pathological work the State presented. Wilson said he

25  questioned why blood wasn't found but thought that an average juror would know that a head

26  

27      [4] The Court further notes that with ground 1(e) Bodden has offered no evidence that such an expert exists or would have provided favorable testimony at trial. She simply argues that an expert perhaps "could

28  have testified" that it would have been difficult to use a cherry picker to move a body. (ECF No. 18 at 35.) Such speculation is insufficient to establish prejudice. See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir.1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").

1    wound could cause significant bleeding. Haddix told Wilson that head wounds may or may not

2    bleed a lot. This Court also notes that Wilson retained forensic entomologist David Faulkner but

3    did not call him as a witness because Faulkner told Wilson he could not determine with any

4    accuracy when Rob died, and he could not say that the murder did not occur on the 15th or 16th

5    of August.

6        This Court concludes that ground 1(c) is not a substantial claim of ineffective assistance

7    of counsel. The jury heard from law enforcement and crime scene investigators that no blood or

8    DNA was found in the hangar. Wilson consulted with experts regarding the lack of blood found

9    in the hangar; they offered several possible explanations, including that some head wounds do

10   not bleed significantly. The defense highlighted the lack of physical evidence found in the

11   hangar. Counsel was not ineffective for failing to call a biologist to testify to what jurors' own

12   common sense could tell them—that the lack of blood or DNA found could be favorable to the

13   defense. The claim is not substantial, nor could Bodden show deficiency and prejudice. Ground

14   1(c) is, therefore, dismissed as procedurally barred from federal review.

15            **e.  Cumulative Error**

16       Finally, in ground 11 Bodden insists that the cumulative effect of counsel's errors in her

17   case deprived her of her Fifth and Fourteenth Amendment due process rights.  The Ninth Circuit

18   Court of Appeals has held that "[t]he Supreme Court has clearly established that the combined

19   effect of multiple trial court errors violates due process where it renders the resulting criminal

20   trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007).

21       The Nevada Supreme Court was unpersuaded that counsel erred: "Where, as here,

22   appellant fails to demonstrate any error of counsel, there can be no error to cumulate. We

23   therefore conclude that the district court did not err in denying this claim."

24       Bodden has not shown deficiency and prejudice with respect to any of her claims of

25   ineffective assistance of counsel. The Nevada Supreme Court's rejection of the cumulative error

26   claim was not unreasonable. Ground 11 is denied.

27       The petition, therefore, is denied in its entirety.

28

**V.      Certificate of Appealability**

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. See 28 U.S.C. § 2253(c); Turner v. Calderon, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. Id.

Having reviewed its determinations and rulings in adjudicating Bodden's petition, the Court finds that none of those rulings meets the Slack standard. The court therefore declines to issue a certificate of appealability for its resolution of Bodden's petition.

**VI.      Conclusion**

**IT IS THEREFORE ORDERED** that the petition (ECF No. 18) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is denied.

**IT IS FURTHER ORDERED** the Clerk of the Court is directed to substitute Frank Dreesen for Respondent Jo Gentry.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly and close this case.

**DATED:** This 2 day of January 2025.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**